IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


**ILYA A. DUMITRASH,**                           3:11-CV-01062-BR

      Plaintiff,

                                                OPINION AND ORDER

v.

**RECONTRUST COMPANY, N.A; BAC
HOME LOAN SERVICING, LLP; and
FEDERAL NATIONAL MORTGAGE
ASSOCIATION,**

      Defendants.


**ILYA A. DUMITRASH**
11439 N.E. Shaver Street
Portland, OR 97220

      Plaintiff, *Pro Se*

**PILAR C. FRENCH
SKYLER M. TANNER**
Lane Powell, PC
601 S.W. Second Avenue
Suite 2100
Portland, OR 97204-3158
(503) 778-2170

      Attorneys for Defendants

**BROWN, Judge.**

1 - OPINION AND ORDER

This matter comes before the Court on Defendants' Motion (#57) for Summary Judgment. For the reasons that follow, the Court **GRANTS** Defendants' Motion.

## BACKGROUND

On May 12, 2011, Plaintiff Ilya A. Dumitrash filed a complaint in Multnomah County Circuit Court against Recontrust Company, N.A.; BAC Home Loan Servicing, LP; and Federal National Mortgage Association (Fannie Mae) in which Plaintiff alleged Defendants improperly foreclosed on Plaintiff's property on April 19, 2010. Plaintiff sought a judgment setting aside the sale of the property at foreclosure, declaring the foreclosure sale to be "null and void without force and effect," and ordering Fannie Mae to "deliver the trustee's deed to the court and the deed be cancelled."

On August 1, 2011, Plaintiff Bank of America NA became the successor by merger to Defendant BAC Home Loans Servicing, LLP. On August 31, 2011, Bank of America removed the matter to this Court on the basis of diversity jurisdiction.[1]

On October 7, 2011, Defendants filed a Motion to Dismiss Plaintiff's Complaint for failure to state a claim.

On February 7, 2012, Magistrate Judge Acosta issued Findings

---

[1] Plaintiff did not serve Recontrust or Fannie Mae before the matter was removed to this Court.

2 - OPINION AND ORDER

and Recommendation in which he recommended the Court grant Defendants' Motion to Dismiss and grant Plaintiff leave to file an amended complaint to cure the deficiencies set out in the Findings and Recommendation.

On March 26, 2012, Judge Malcolm F. Marsh adopted the Findings and Recommendation, granted Defendants' Motion to Dismiss, and granted Plaintiff leave to file an amended complaint.

On April 25, 2012, Plaintiff filed an Amended Complaint in which he seeks a declaration that "the non-judicial sale of Plaintiff's property was improper, in that the trustee failed to record all transfers of beneficial interest in the trust deed prior to initiating non-judicial foreclosure."  Am. Compl. at ¶ 12.

On July 11, 2012, Skyler Tanner, defense counsel, sent Plaintiff's counsel, Matthew Daily, an email in which Defendants offered to settle this matter for $2,500 in exchange for Plaintiff moving out by September 1, 2012, and dismissing his Amended Complaint.  Decl. of Skyler Tanner, Ex. 1 at 9.

On September 18, 2012, Daily advised Tanner via email that Plaintiff would settle the matter for $20,000 but not for $2,500. Plaintiff did not suggest a date that he would vacate the premises.

On September 24, 2012, Tanner left Daily a voicemail

3 - OPINION AND ORDER

regarding settlement. On September 25, 2012, Tanner spoke with Daily by telephone. On the voicemail and/or during the telephone conversation, Tanner advised Daily of Defendants' counteroffer of $8,000 to settle the matter in exchange for Plaintiff vacating the premises by November 15, 2012, and dismissing this action.

On October 2, 2012, Tanner sent Daily an email recapping the September 25, 2012, settlement offer.

On October 9, 2012, Daily advised Tanner via email that $8,000 "was fine," but asked if the date for Plaintiff to vacate the premises could be moved to December 15, 2012. Tanner Decl., Ex. 1 at 7.

Also on October 9, 2012, Tanner advised Daily via email that Defendants agreed to extend the date to December 15, 2012, for Plaintiff to vacate the property. Tanner noted "[w]hile the final details, including the language of the release, of this agreement will still need to be finalized, I believe we have enough of an agreement to inform the court under LR 41-1(a). Will you send that notice or would you prefer that I do so?" Tanner Decl., Ex. 1 at 7.

On October 10, 2012, Daily asked Tanner via email to notify the Court of the parties' settlement and advised Tanner that he would prepare the dismissal.

On October 12, 2012, the Court entered a 60-day Order of Dismissal:

4 - OPINION AND ORDER

> The Court having been informed by counsel for the parties that this action has been settled, IT IS ORDERED that, pursuant to LR 41-1, this action is dismissed with prejudice and without costs and with leave, upon good cause shown within sixty (60) days, to have this order of dismissal set aside and the action reinstated if the settlement is not consummated.

On October 26, 2012, Daily emailed Tanner and asked about the "status of [the] settlement agreement." Tanner Decl., Ex. 1 at 6.

On November 19, 2012, Tanner emailed Daily, attached the settlement agreement, and asked Daily to advise Tanner after he had "reviewed it with [his] client and approved it." Tanner Decl., Ex. 1 at 5. Tanner advised Daily that when she heard from him, she would "get the signatures started on [her] end." *Id*.

On November 20, 2012, Tanner emailed Daily and inquired whether he had "a chance to review [the settlement agreement] with [his] client?" Tanner Decl., Ex. 1 at 5. Tanner explained she was "hoping we can get it signed soon so that we have sufficient time to process the check before your client has to move out" on December 15, 2012. *Id.*

On November 26, 2012, Daily responded to Tanner via email and advised he had not had a chance to review the document because he had been out of the office. Also on November 26, 2012, Daily emailed Tanner and noted the agreement "look[ed] fine and was what [he] was expecting," but Daily noted "the other agreements I have seen from you [*sic*] office have a vacate date

5 - OPINION AND ORDER

from the date of execution. Can we do something like that here so [Plaintiff] can move after Christmas?" Tanner Decl., Ex. 1 at 4.

On November 27, 2012, Tanner advised Daily via email that she would consult with her clients as to changing the date on which Plaintiff had to vacate the premises to "after Christmas." Tanner Decl., Ex. 1 at 3. Later on November 27, 2012, Tanner advised Daily in an email that Defendants "view[ed] the requested extension of the move-out date to be a material change and [had] declined to modify the settlement agreement to extend the move-out date from December 15." Tanner Decl., Ex. 1 at 3.

On November 29, 2012, Daily responded to Tanner's second November 27, 2012, email: "That's ok. Thanks for trying. I told the client about the date but then we did not have paperwork for quite some time and he was confused about the dates. I will get the clients [sic] signature tomorrow and send it back over to you on Monday." Tanner Decl., Ex. 1 at 3. Tanner responded: "I will watch for the paperwork on Monday. . . . Thanks for your help in wrapping this up." Tanner Decl., Ex. 1 at 2.

On Wednesday, December 5, 2012, Tanner emailed Daily and asked whether he would "follow up with [Plaintiff] to get this agreement signed as soon as possible?" Tanner Decl., Ex. 1 at 2.

On December 6, 2012, Daily and Tanner spoke by telephone, and Daily advised Tanner that he had arranged with Plaintiff to

6 - OPINION AND ORDER

sign the document at a specific location.

On December 7, 2012, Daily telephoned Tanner and advised her that he had not received the signed original from Plaintiff. Daily indicated Plaintiff no longer wanted to sign the agreement because his "alternate housing option" was unavailable.  Tanner advised the agreement was binding on Plaintiff, and Defendants would seek to enforce it.  Daily said he understood and noted "given plaintiff's repudiation, the bank would be able to evict [Plaintiff] from the property 'for free' (which [Tanner] believe[d] meant without making the settlement payment)."  Tanner Decl. at ¶ 4e.  Tanner encouraged Daily to discuss with his client the consequences of not following through with the agreement, and Daily said he would try to talk to Plaintiff again.

On December 10, 2012, Tanner sent Daily an email inquiring whether Daily was "able to convince [Plaintiff] to stick to the agreement?"  Tanner Decl., Ex. 1 at 1.

On December 11, 2012, Tanner left Daily a voicemail seeking to confer on Defendants' Motion for Extension of Time to Extend Deadline to Reopen Case.

On December 11, 2012, Defendants filed a Motion for Extension of Time to Extend Deadline to Reopen Case.

On December 14, 2012, Tanner asked Daily via email whether Plaintiff was vacating the property the next day.

7 - OPINION AND ORDER

On December 28, 2012, and January 3, 2013, Tanner left Daily voicemails seeking to confer on Defendants' Motion for Extension of Time to Extend Deadline to Reopen Case.

On January 4, 2013, Tanner and Daily spoke via telephone, and Daily indicated Plaintiff "continued to refuse to execute the agreement." Tanner Decl. at ¶ 4i. Daily also advised Tanner that Daily "would be seeking to withdraw from representation because he was 'at odds' with [P]laintiff."

On January 4, 2013, Defendants filed an unopposed Motion to Reopen Case. On January 7, 2013, the Court granted Defendants' Motion.

On March 11, 2013, Daily advised the Court at a status conference that he would be moving to withdraw as Plaintiff's counsel.

On April 5, 2013, Defendants filed a Motion for Summary Judgment seeking to enforce the settlement agreement.

On May 14, 2013, the Court held a telephone conference to address Plaintiff's failure to respond to Defendants' Motion for Summary Judgment as well as Daily's failure to file a motion to withdraw as Plaintiff's counsel. The Court attempted unsuccessfully to contact Daily for 15 minutes and finally proceeded to conduct the hearing without him. The Court entered an Order taking Defendants' Motion for Summary Judgment under advisement on that date.

8 - OPINION AND ORDER

On May 16, 2013, the Court held a telephone status conference at which time Daily requested to withdraw as counsel for Plaintiff.  After Daily agreed to attempt to contact Plaintiff at his last known address and through a third party, Victor Mikityuk, the Court granted Daily's request to withdraw as attorney for Plaintiff.  The Court also set June 7, 2013, as the date for Plaintiff to respond to Defendants' Motion for Summary Judgment and stated the Court would take Defendants' Motion under advisement on June 7, 2013, if Plaintiff did not file a response.

On May 17, 2013, the Court issued a Summary Judgment Advice Notice to Plaintiff and also mailed copies of all papers pertinent to the pending Motion for Summary Judgment to Victor Mikityuk, who was believed to know Plaintiff's whereabouts.

Plaintiff did not file a response to Defendants' Motion, and the Court took the Motion under advisement on June 7, 2013.


## **DISCUSSION**

When deciding issues of contract formation, federal courts apply state law rather than federal common law.  *See, e.g., Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003)(contract formation is a substantive issue and state contract law applies to the issue of formation).

Under Oregon law whether a contract exists is a question of law.  *Dalton v. Robert Jahn Corp*., 209 Or. App. 120, 132 (2006)

(citation omitted).  An agreement to settle an action can constitute a valid and enforceable contract.

> In Oregon
>
>> as to a contract's essential terms, a valid contract exists . . . when there is a meeting of the minds and where all terms are either agreed upon or there is a method agreed upon by which open and disputed terms can be settled, such that nothing is left for future negotiation.

*Id.* (citing *Phillips v. Johnson*, 266 Or. 544, 555-56 (1973)). "Oregon subscribes to the objective theory of contracts.  In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Id.* (quotation omitted).  "In Oregon . . . settlement agreements are enforceable once agreed upon, unless the parties intend their agreement to become enforceable only after it is reduced to writing." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004)(citation omitted).  *See also Hughes v. Misar*, 189 Or. App. 258, 264 (2003)("When parties agree on the essential terms of a contract and there is nothing left for future negotiations, the fact that they also intended there to be a future writing that expresses their agreement more formally does not affect the immediately binding nature of the agreement.").

Here the record reflects an offer to settle by Tanner and acceptance of the offer by Daily.  Tanner memorialized the terms of the parties' settlement agreement in her October 9,

10 - OPINION AND ORDER

2012, emails. Daily confirmed the parties' agreement in his October 10, 2012, email. In addition, the parties advised the Court of the settlement on October 12, 2012. There is not any indication in the record that the parties intended the settlement to be reduced to writing before it was enforceable. In fact, the record suggests the parties intended the settlement agreement to be binding on October 9 or 10, 2012, and that the documents were a mere formality to "serve the purpose of a memorial of a completed contract already made." *See Dalton*, 209 Or. App. at 136. Accordingly, "the failure to execute the writing does not prevent the existing agreement from binding the parties." *Id*.

In similar circumstances the Oregon Court of Appeals did not have any "difficulty concluding that the parties agreed to settle." *In re Marriage of Baldwin,* 215 Or. App. 203, 207 (2007).

> On June 9, 2006, Diane's attorney e-mailed a "final" settlement proposal to Karen's attorney. That proposal stated that Karen, or her assignee, would receive one-third of the disputed amount and Diane would retain two-thirds of the disputed PERS benefits. In addition, Diane agreed to make the settlement fully retroactive. On June 13, 2006, Karen's attorney e-mailed Diane's attorney that Diane's June 9, 2006 offer was "acceptable to Karen" and that a formal acceptance would follow. On June 20, 2006, Diane's attorney e-mailed Karen's attorney confirming Karen's acceptance of Diane's June 9 offer. On June 26, 2006, Karen's attorney wrote Diane's attorney "confirm[ing] that we have agreed to settle the parties' dispute about the distribution of John Baldwin's PERS account." After noting that the domestic relations order would need to be amended, Karen's

11 - OPINION AND ORDER

> attorney wrote that, "assuming that the rest of the deal is consummated, we will agree to dismiss the appeal."
>
> A different attorney was responsible for drafting an amended domestic relations order. Over the next few months, the attorneys exchanged e-mails regarding the proposed order. On August 2, 2006, Karen's attorney wrote Diane's attorney, expressing some concern regarding paragraph eight of the proposed order. However, Karen's attorney wrote that it was Diane's attorney's "call" regarding paragraph eight, and that "the rest of the order looks okay to me." That same day, Diane's attorney wrote to Karen's attorney regarding the changes to the proposed order. On September 20, 2006, Karen's attorney wrote Diane's attorney stating, "[p]lease let me know whether the present DRO will be acceptable. We also want to get this wrapped up—or not—as soon as possible." On November 14, 2006, Diane's attorney e-mailed Karen's attorney stating that Diane was ready to sign the proposed order, with two exceptions. The exceptions concerned paragraph eight regarding the manner and timing of the retroactive payment, and paragraph nine regarding taxability. According to Diane's attorney, the retroactive payment issue was resolved, and he suggested deleting paragraph nine. Diane's attorney asked Karen's attorney if the two changes were acceptable. There was no response to Diane's attorney's e-mail. On December 5, 2006, Karen filed a substitution of attorney. Karen's new attorney informed Diane's attorney that Karen did not want to settle and that she wanted the appeal to go forward.

*Id*. at 206-07. As noted, the Oregon Court of Appeals found the parties had consummated an agreement to settle. The court reasoned:

> The June 2006 exchange of e-mails between the parties' attorneys constituted the making of a contract. Diane's attorney's letter of June 9 to Karen's attorney was an offer, and Karen's attorney's response was an acceptance of that

12 - OPINION AND ORDER

>offer. Karen's attorney even wrote that a more formal "acceptance" would follow, and Karen's attorney's June 26, 2006, letter was that formal acceptance. The exchange of e-mails between the attorneys for the parties demonstrated the requisite agreement on the same essential terms of the settlement.
>
>The lack of a signed agreement is not dispositive; "[w]hen parties agree on the essential terms of a contract and there is nothing left for future negotiations, the fact that they also intended there to be a future writing that expresses their agreement more formally does not affect the immediately binding nature of the agreement." *Hughes*, 189 Or. App. at 264, 76 P.3d 111; *see also Kaiser Foundation Health Plan v. Doe*, 136 Or. App. 566, 903 P.2d 375 (1995), *modified on recons.*, 138 Or. App. 428, 908 P.2d 850, *rev. den.*, 324 Or. 394, 927 P.2d 600 (1996)(Where attorneys reached agreement on the essential terms of a settlement and the defendant accepted those terms, the defendant's acceptance was sufficient to make the settlement immediately binding.).

*Id*. at 207-08.

Even if Plaintiff contends he did not agree to settle the matter, the record reflects Daily represented Plaintiff in all matters before this Court at the time that Daily communicated agreement of the settlement to Tanner.

In *Kaiser Foundation Health Plan of the Northwest v. Doe*, 136 Or. App. 566 (1995), the circumstances were similar to those of this case. The defendant alleged she had been sexually harassed by a doctor employed by the plaintiff. The defendant filed a grievance with her union and a complaint with the Oregon Bureau of Labor and Industry (BOLI). The defendant agreed to mediate with a private mediator, but the defendant rescinded the

13 - OPINION AND ORDER

oral agreement reached during mediation by her counsel.  The plaintiff filed a complaint seeking a declaration that the parties had entered into an enforceable oral settlement agreement and sought specific enforcement of agreement.  The trial court concluded the agreement was unenforceable.  The Oregon Court of Appeals reversed and held, among other things, that "even if [the defendant] was unaware of some of the terms in the offer, [she] had vested [counsel] with apparent authority to bind her."  *Id*. at 573.  Thus, when apparent authority is established, a settlement agreement entered into by counsel is enforceable even if the client attempts to rescind the agreement.  The court noted in *Doe* that "[a]ctual authority is either express or implied.  Express authority is that authority that the principal confers upon the agent in express terms.  The express authority to do a certain thing carries with it the implied authority to do those other things that are reasonably necessary to carry out the authorized task."  *Id*. at 573 n.3 (citation omitted).  Moreover,

> [a] principal is bound by the acts of its agent when the acts are within the scope of the agent's real or apparent authority.  *Roby's Enterprises v. Hanover Development Corp*., 67 Or. App. 594, 599, 679 P.2d 871 (1984).  In this case, there is ample evidence from defendant's objective manifestations to indicate that she gave [counsel] actual authority to accept the settlement offer, not just to tell plaintiff to draft a proposed agreement.  *See also Kitzke v. Turnidge*, 209 Or. 563, 573, 307 P.2d 522 (1957)("The law of contracts is not concerned with the parties' undisclosed intents and ideas.").

14 - OPINION AND ORDER

*Id*. at 573.

As noted, Daily was Plaintiff's counsel and, therefore, his agent in this matter for at least 19 months. Daily filed the Complaint and Amended Complaint in this matter on Plaintiff's behalf, litigated a Motion to Dismiss, and attended numerous conferences and hearings on behalf of Plaintiff. Daily represented to Tanner that he had the authority to settle this matter, and there is not any evidence in the record that Daily did not have that authority.

On this record the Court concludes Daily had apparent authority to settle this action. In addition, Daily and Tanner reached a binding and enforceable settlement in the amount of $8,000 and agreed to December 15, 2012, as the date for Plaintiff to vacate the property. Accordingly, the Court grants Defendants' Motion for Summary Judgment to enforce the settlement.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion (#57) for Summary Judgment. The Court, therefore, **ORDERS** specific performance of the Settlement Agreement entered into by the parties on October 9 and 10, 2012, and **DISMISSES** Plaintiff's

15 - OPINION AND ORDER

First Amended Complaint **with prejudice**.

    IT IS SO ORDERED.

    DATED this 31st day of July, 2013.

                                        /s/ Anna J. Brown

                                        _____
                                        ANNA J. BROWN
                                        United States District Judge